JAMES WAINRIGHT, ADMR., v. LAKE SHORE & MICHIGAN SOUTHERN RAILWAY CO.

1. QUESTIONS INVOLVED IN DETERMINING WHETHER VERDICT IS AGAINST EVIDENCE.

In determining whether a verdict for defendant in an action against a railroad company for wrongful death, is against the weight of the evidence, when questions of negligence of the company and contributory negligence of deceased. are both involved, a reviewing court must, if it is determined that the verdict is against the weight of the evidence on the question of negligence of the company, also determine whether the verdict is against the weight of the evidence on the question of contributory negligence of deceased.

2. JUDICIAL NOTICE OF CITY MAPS.

A court may take judicial notice of the map of a city in order to determine the distance between certain points on a railroad track within its limits.

3. CAUTION NOT TO STAND UPON CARS—IMPLICATION.

A caution given to an inexperienced man upon his employment as a brakeman by a railroad company, to the effect that it would be unsafe for him to *stand* upon box-cars while passing through tunnels or under bridges, carries with it the implication that it would be safe to sit upon such cars while passing through or under such obstructions.

**4. Warning Required as to Overhead Obstructions.**

Where, in order to pass safely through a certain tunnel upon the top of a box-car, it would be necessary to take a recumbent position, it is negligence for the railroad company to put an inexperienced man at work as a brakeman, where he will be required to pass through such tunnel upon the top of such cars, without giving him specific warning, by word of mouth or otherwise, that it will not be safe for him to sit upon the cars.

**5. Negligence to Put in Car Unusually High Without Notice.**

It is negligence for a railroad company to put in its train a box-car considerably higher than ordinary cars of that class, and upon which, in order to safely pass through a certain tunnel, a person on the top of such car would be required to take a recumbent position, without giving specific warning to a brakeman who has been in their employ only a few days and who has been over the line only three times, and never upon a train with such a car, and who may go upon such car in the performance of his duties, that he must not go upon that car, or, if he does, that it will be necessary, in passing through such tunnel, for him to lie down or get into a position lower than that which he would be in by sitting upon the car.

**6. Inadequate Whipping-Straps or Tell-Tales—No Defense.**

It is no defense to an action for the wrongful death of a brakeman who was put at work where he would be required to pass through such tunnel on the top of box-cars, and without warning that he could not safely sit upon such cars, that the railroad company maintained whipping-straps or tell-tales on either end of the tunnel, where it appears that such straps or tell-tales did not hang low enough to reach a person sitting upon a box-car.

**7. Brakeman Not Negligent in Sitting Upon Cars, When.**

A brakeman who has not been cautioned that, for his safety, he must stand, or that in order to be warned by whipping-straps or tell-tales he must stand, but only that he must stand in order that he may perform his duties, is not guilty of negligence in sitting down, when it does not appear that there was any duty incumbent upon him requiring him to stand.

**8. Not Negligent to Sit Upon Edge of Car, When.**

Where a brakeman is not negligent in duty, and where he is not forewarned that it will be essential to his safety to maintain a position upon the center of the car, such brakeman may, without being negligent, occupy a sitting position upon the edge of the car.

**9. Not Required to Look Ahead for Obstructions.**

A brakeman may keep his face turned from the locomotive to avoid the smoke, cinders and gases, or he may look in another direction through indifference or inattention, when not required to do otherwise by his duties, and if not warned by word or circumstance, or former knowledge or observation, that to do so while sitting upon the car will be unsafe, cannot be said to have been negligent in thus acting.

**10. Facts Tending to Justify Brakeman in Not Looking Ahead.**

The fact that a brakeman received warning only that it would be unsafe to *stand* upon a car, that he had passed under other structures in safety while sitting upon the same car, and that no whipping-straps or tell-tales warned him of a lower structure, and the reliance which he might base upon the assumption that the company would do its duty by warning him of anything dangerous, may tend to justify such brakeman in not looking ahead.

**11. Mere Compliance With Rules Would Not Avert Disaster.**

The fact that the rules of the company required the brakeman to be standing, and that if he had been standing the whipping-straps or tell-tales would have warned him that the train was approaching the tunnel, are not sufficient to defeat a recovery, where it appears that if such brakeman had been so warned by the whipping-straps or tell-tales, he might still have assumed that it would have been entirely safe, in view of the character of the warnings received, to sit upon the car and that that would be all he would be required to do to be safe.

**12. CONTRIBUTORY NEGLIGENCE OF BRAKEMAN CANNOT BE ASSUMED.**

And if such brakeman was actually looking ahead, and did see, or might by ordinary care have seen the danger in time to avert it by changing his position, so that his failure to do so would constitute negligence, these facts must be established by proof; since a brakeman is not required to be faced and looking toward the front end of the train, the jury would have no right to assume or guess that he was in that position, and that he saw or might have seen and avoided the danger.

**13. ESTIMATE OF HEIGHT OF STRUCTURE FROM MOVING TRAIN.**

A brakeman in passing through a tunnel or under an overhead structure upon a moving train cannot be required to make such an estimate as will register in his mind that if he should pass through or under such structure on a car somewhat higher than the one upon which he is riding, he could not sit up with safety.

**14. OBJECTIONABLE CHARGE AS TO OBVIOUS DANGERS.**

A charge which directs the jury that if the dangers could be readily observed, or were open, apparent or obvious to a man of ordinary observation, or if they could be readily seen and appreciated, then the company was not under obligation to give warning to its employees, without qualifications as to time or circumstances, or opportunity for observation, in view of duties to be performed, is objectionable.

**15. RULE AS TO OBVIOUS DANGERS.**

A peril that might be visible and apparent to a person in a favorable position and under favorable circumstances might not be obvious to another person, in the same sense or degree, whose position is less favorable to observation and appreciation of the danger. Therefore, whether a servant was guilty of negligence in failing to note and avoid a peril of which he had no previous knowledge, or whether he would be entitled to notice thereof, must depend upon whether in the exercise of ordinary care under all the circumstances he should have discovered it in time to avoid it.

HEARD ON ERROR.

*E. D. Potter*, for plaintiff in error.

*Hurd, Brumback & Thatcher*, for defendant in error.

PARKER, J.

An action was instituted in the court of common pleas, by Wainright as administrator of the estate of Louis E. Canfield, deceased, against the Lake Shore & Michigan Southern Railway Company to recover on account of the death of deceased, which it is alleged was produced by the wrongful act of company. It appears that deceased was an employe and brakeman of the defendant, and that while in the line of his duty, riding upon a freight car along the road of defendant, in this city he came in contact with the stonework of an aqueduct conveying a canal over the road of defendant company, and received a blow and wound, from which he died.

The charges in the petition are, that the defendant company was negligent in these respects:

First, because of its failure to lower its tracks sufficiently, so that a person passing through what has been called a tunnel under this aqueduct and while upon the top of a train of cars, in the line of his duty, which required him to be there, would not come in contact with the stone-work.

Second, on account of its failure to maintain proper whipping-straps, warning-straps or "tell-tales," to warn one approaching this overhead construction, so that he might duck or dodge or take a safe position. It is alleged that these whipping-straps were not as long as they should have been or did not hang down as far as they should; that this was in

consequence of their being improperly constructed in the first instance or because they had become out of repair, been whipped out at the ends and shortened up.

Third, on account of its failure to notify deceased of the danger of attempting to ride under this overhead structure upon freight cars, especially upon large box-cars, used for furniture, such as the one upon which he was riding at the time of the accident which resulted in his death.

The answer denies that there was any negligence in any of these respects, and avers that if this was not in law a pure accident, it was the result of contributory negligence of the deceased.

The jury returned a verdict for the railway company. A motion was made by the administrator for a new trial, on the following grounds:

First, that the court erred in rejecting evidence offered by the plaintiff.

Second, that the court erred in admitting evidence on behalf of the defendant over the exceptions of the plaintiff.

Third, that the court erred in refusing to charge the jury as requested by the plaintiff.

Fourth, that the court erred in its charge to the jury.

Fifth, that the verdict is contrary to the weight of evidence.

Sixth, that the verdict is contrary to law.

This motion was overruled and judgment was entered upon the verdict, and the administrator of deceased prosecutes error here, averring in his petition in error precisely the same grounds of error as those stated in the motion as grounds for a new trial.

Without stopping to discuss the various alleged errors in the admission or rejection of evidence, we will simply say that we have examined all of them and we find no error in either of those respects.

It is contended with great earnestness that the verdict is against the weight of evidence and that the court erred in its charge to the jury, and that this verdict is probably the result of the jury having been to some extent misled by a certain paragraph in the charge of the court, as to the law on the subject of obvious danger applicable to the case.

The rules which should govern this court in determining the question whether a judgment should be set aside on error on the ground that the verdict is against the weight of evidence, have been stated in various forms by our Supreme Court and are familiar to the profession, so that a statement of them, with fullness, need not be undertaken here, but we refer as applicable and pertinent to the inquiry here, to what was said by Judge McIlvaine in Dean v. King & Co., 22 Ohio St., 118, reading from page 134:

" Motions for new trials, upon the ground that the verdict is against the weight of evidence, are addressed to the discretion of the court, and if granted, the judgment will not be disturbed on error unless the case is so strong as to show an abuse of the discretion." (Citing cases.) " And if the motion be overruled, a reviewing court should not reverse, unless the verdict (or finding of fact, if the jury be waived) is so clearly unsupported by the weight of evidence as to indicate some misapprehension, or mistake, or bias on the part of the jury, or a wilful disregard of duty."

It is not claimed here, and there does not appear to be any ground for claiming, that there was any bias on the part of the jury in favor of the railroad company and against the plaintiff, or that there

was any wilful disregard of duty on the part of the jury. The return-
ing of a verdict in favor of a railroad company by a jury, in a case at
all close, where there is a fair excuse for returning a verdict in favor of
the plaintiff, is a thing so uncommon and extraordinary, that, where a
question of this kind is presented, we feel like giving it very careful
examination.

The question, then, is, whether the record indicates that there was
misapprehension or mistake on the part of the jury? It devolved
upon the plaintiff below to establish negligence upon the part of the
company in some one or more of the particulars alleged. So we have
to inquire whether, if the verdict is wrong if it was returned upon the
theory that there was no negligence established; whether it is against the
manifest weight of the evidence on that head.

On the other hand, the verdict may have been founded upon the
theory or conclusion that the plaintiff below was guilty of contributory
negligence, so that if we conclude that the verdict is against the weight
of the evidence, on the question of the negligence of the company, we
are then required to go farther and inquire whether the verdict was
against the weight of the evidence upon the question of contributory neg-
ligence. We have examined the case upon both of these grounds.

It appears that the deceased was what is called a "green hand."
He had been employed by the railroad company as a brakeman but a few
days before this accident. This was his first employment and his first
service in that capacity. At the time he met his death, he had made
three trips over the section of the road that his duties called him to, that
is to say, between Air Line Junction, in the city of Toledo, the western
terminus of his route, and the city of Cleveland, the eastern terminus
thereof, and this was his fourth trip, second *round* trip, or second " lap "
over that section of the road ; so that he had passed under this aqueduct
three times, and while the train was passing under it the fourth time,
this accident occurred.

It does not appear whether when he passed under this aqueduct on
the other occasions, he was upon a box-car or a flat car, or where he was
actually riding, but it does appear that he had not passed through on
any occasion upon one of these large box-cars called " furniture cars,"
since it appears that there had not been, on either of the other occasions,
a car of that description in the train on which he was riding and serving
as brakeman.

The height of this structure, at the middle, was sixteen feet four
and three-quarter inches ; that it was in the form of an arch, so that at
the sides the top or roof was somewhat lower than at the center; that he
could not pass through it upon an ordinary box-car standing erect, but
that he could pass through it upon an ordinary box-car in a sitting posi-
tion. Also that he could not pass through it sitting upright upon a furni-
ture car. Furniture cars are from two to three feet higher than ordinary
box cars, the car upon which he was riding on this occasion being four-
teen feet high, so that the distance between the top of the car, at the
middle, where the running board is, and the highest part of the arch,
the part under which the running board passed directly, was two feet,
three and three-quarter inches, and that space gradually lessened toward
the sides of the car so that at the eaves of the car the distance was only
twelve inches.

No one saw the accident. No one saw the deceased immediately
before he reached the tunnel. The train upon which he was riding was

passing to the westward through this tunnel, approaching Air Line Junction, some distance west of the tunnel. The accident happened shortly after noon, in broad daylight.

A Mr. Gillespie testifies that about the time this train passed he was walking along the side-track of the Clover Leaf road to the eastward of this tunnel, when a train which, in its general description answers to this one passed towards the west, and that a man was sitting upon a box-car near the locomotive ; that he was sitting near the middle of the car, upon its south side, facing to the south ; that he was sitting upon the edge of the car with his legs hanging over the eaves. That, *probably*, was the deceased ; but, how far the car upon which he was riding was, at that time, eastward from this aqueduct, does not appear. Taking judicial notice of the map of the city, we judge that distance may have been anywhere from five hundred feet to one thousand feet (it may have been more and it may have been less), so that it does not appear but what the deceased had ample time, after Mr. Gillespie saw him, to change his position upon the car, either by drawing himself up towards the middle and sitting on or near the running-board, or even taking a standing position upon the car.

The train appears to have been going westward at the rate of about ten miles an hour. There were but five cars besides the caboose in the train. The deceased was head brakeman. It was his duty, under the rules of the company, to be upon a car near the head of the train while passing along that part of the road. He appears to have been in the line of his duty, upon this car. After the train had passed through the tunnel, and perhaps after it had reached the junction, search was made for the deceased and he was found upon the top of the car, near its east end, with a wound on the right side of his head, which was sufficient to produce death, the skull being fractured, and in an insensible condition.

It does not appear that the deceased had been cautioned, especially, that it would be unsafe for him to sit in an upright position upon a furniture car while riding through that tunnel. He had been told of the tunnel ; he seems to have known of the tunnel ; he knew it was there ; he had been cautioned that it would not be safe for him to attempt to pass through it while standing upright upon a freight car ; that he would not " clear," I think is the way the witness puts it. On that subject we have the testimony of Mr. Kean, formerly the agent of the company, at Elmore. I read from page 55 of the record, where he testifies as follows :

" Q. Did you have any conversation with him at that time,"(Meaning deceased) " or he with you, with reference to any obstructions or overhead obstructions, along the line of the road ? " (This referred to the night before the deceased began work and when he contemplated going to work and had, perhaps, been employed to go to work.)

" A. Between the time that he made the application and the time that he went to work for the company he was in the habit of dropping into the office. That was about all the conversation, dwelling upon the fact that he must look out for these bridges, or one thing and another; that he was liable to get struck with; among others, this tunnel. I told him I had always understood that it wouldn't clear a man standing on a car. I had always understood, anyhow, that it wouldn't clear a man standing on a car."

And on page **57**, he repeats that : " There was a bridge in Toledo that wouldn't clear, and it had struck a man that I knew and killed him ;

this tunnel wouldn't clear a man on a car—something like that—that is, I understood it wouldn't clear a man on a car."

This, he says, he had stated to the deceased.

Mr. Eoff, a brakeman in the employ of the company, testified, page 52, that after the deceased had told him he had got a job and was going to work for the company, he said he was very glad of it; quoting:

"I says ' it is very cold weather and you want to look out for yourself; frosty nights, you just going on the road. These pins and links are liable to break. Look out for yourself in walking over the tops of cars to see that they are not broke in two. Also, look out for the bridges from Air Line Junction and the river—Oak Street bridge will hit you, Broadway will hit you, and the tunnel.' He says ' Jake, I have got a good pair of gloves and a cap.' I says ' That is right; keep yourself warm.'"

The witness was asked whether the deceased said anything to him about having knowledge of the tunnel and he answered that he could not say that he did.

Another brakeman by the name of Haack, testifies, at page 59 :

"I told Canfield that he should watch out for the Toledo yards. I says (Look out for the bridges, especially the tunnel.) I says be careful, Lou, so you don't get caught there ? That is just what I told him."

And he says the deceased said to him that he knew about the tunnel and the bridge. That is the substance of all the evidence upon the subject of direct caution or notification to the deceased.

Evidence was introduced of a card stuck up in the caboose containing a caution to the employees of the company that they must take care and avoid danger to themselves while on the tops or sides of trains when approaching and passing bridges, wires, switches and other obstacles.

This is all the evidence as to any caution to him. There is no evidence of any cautionary remark or statement of any person whose duty it was to caution him, and no statement to him of caution by anybody that it would be unsafe for him to *sit* upon the cars, but the statement was that it would be unsafe for him to *stand* upon the cars, and that, we think, carried with it the implication, since it was his duty to be upon that car, that he might safely *sit* upon it.

And in these cautionary remarks nothing was said about any particular kind of cars, that is, he was not told that it would be safe for him to sit upon the lower or smaller box-cars, but that it would not be safe for him to stand upon the taller freight cars, or large box-cars. The statement was general, that it would be unsafe for him to stand upon the box-cars in passing under certain overhead obstructions; that, as we think, carrying the implication that if he did not stand, he would be safe.

Now it appears that in order to pass under this aqueduct upon a furniture car, without collision, it would be necessary for a person to take a recumbent position, not lying down flat, but a position somewhat between lying flat and sitting.

We are of the opinion that it is negligence upon the part of a railroad company to put a man at work as brakeman upon its trains where he is required to pass under an overhead obstruction of this character on the top of its box-cars, without distinct warning of the danger. To be more specific it was negligence on the part of the railroad company in this instance, to put the deceased at work upon this train, where he was required to pass under this overhead structure, and make it his duty to be upon the top of the car, without giving him specific warning, by word of

mouth or otherwise, that it would not be safe for him to sit upon the car; or, stated in another form, which I regard as setting forth the same principle, it was negligence on the part of this railroad company to put that large car in its train upon which deceased was riding and serving as a brakeman without cautioning him that he must not go upon that car in the performance of his duty, or, if he did, that it would be necessary for him to lie down or to get into a position lower than that he would maintain in sitting upon the car to pass through the tunnel.

As to these whips serving as a warning. It appears that they were placed to the eastward of this aqueduct about one hundred and six feet and that they were fastened to an overhead apparatus that allowed them to hang down so that a person standing upon a box-car would come in contact with them with his head and shoulders, and they would serve to warn a person in that position that he was approaching an overhead obstruction and must duck, but they did not come as low as the obstruction, not nearly as low as the roof of the arch at the sides, and not as low as the arch at the center. They ran substantially straight across, and above the middle of the track they were from six to eight inches higher than the lowest portion of this arch at that point. The result of the situation was this: That a person sitting upon this car, near the center of it, a person of ordinary height, sitting upright upon a furniture car would pass under these whips and therefore not be warned by them; he would pass on to the arch and his shoulders would just about go under the center of the arch and then the stone-work of the arch would strike him on the head. And that is the way, we conclude, from the evidence in this case, this accident occurred. Notwithstanding the testimony of Mr. Gillespie, that some time before reaching the arch, this man was sitting upon the edge of the car, we think it a thing incredible that he could have been sitting upon the edge of the car when he reached the tunnel and yet receive the wound upon the head, and that that should be the only injury he sustained.

And further we think it incredible that he should have been sitting on the edge of the car and yet should have been found in the position in which he was found upon this car after the accident; for, if he had been sitting upon the edge of the car with only twelve inches space between the top of the car and the stone-work at that part of the arch, when he came in contact with the stone-work it must have inevitably swept him from the top of the car; at all events, he could not have passed through the whole distance of a hundred feet of that arch without being rolled or swept from the car, and, furthermore, he would have received a wound upon his shoulder, as that would have been the part of his person to come in contact first with the arch if he were riding in the position described by Gillespie. It appears, however, that the right side of his head was the part that received a wound. The witnesses testified to that wound only, and the record contains the admission that he received that wound, that from that wound he died, and there is no statement or suggestion anywhere in the record that he received any other wound, or that there was any bruise on his shoulder or side, such as he would have received had he come in contact with the stone-work with his person, below his head.

As to his position upon the car, Baker, the conductor, at page **15**, says that he found him upon the head car, on the east end of it, with *one leg* hanging over the south side of the car, and his head was towards the running board. Nothing upon the car indicated that he had been

dragged along the top of the car—nothing that he saw—and there is no evidence of any kind that he was dragged along the top of the car, and Richards, the engineer, testifies, at page 31, giving him a position still further up upon the car and nearer to the running-board. He says he was right close to the end of the car, that he lay straight from the running-board down to the edge.

"Q. With his feet hanging over the edge of the car?" "A. I don't think they were; I wouldn't say positively. They might possibly have been sticking over a few inches. He lay with his head just about level with the edge of the running board."

We do not see how it is possible that he reached that position, by the operation of the train passing through the tunnel, if he had been sitting in the position in which Mr. Gillespie says he saw him. We think he must have been sitting near the center of the car, upon or near the running-board, so that he passed under these whips and went on to the tunnel, evidently, with his face averted and not looking towards the tunnel, and his shoulder passed into the tunnel, receiving no wound, and then he was struck upon the side of the head. The height of the tunnel and the distances given would admit of the accident happening precisely in that way, and we think this theory is sustained by all the evidence.

We cannot conceive of a trap being purposely contrived that would be more successful in luring him on to his death than this arrangement, and therefore we think it was negligence. While these remarks may seem to be strong, and possibly harsh, we do not mean to intimate, of course, that there was any wrong purpose; it was simply the result of an oversight; nor do we mean that our remarks shall be made use of in another trial of this case to a jury. The jury will have no business with our views of the facts.

Was the deceased guilty of contributory negligence? We think not. It being his duty to be upon the top of the car and he not having been warned that it would be unsafe for him to be there in what would be the usual position of one not standing, we think that he might sit there in the performance of his duty and not look out for this obstruction and yet not be guilty of negligence; that he would have no reason to anticipate that there would be an overhead structure that would make it unsafe for him to sit upon the car.

It is said that he was negligent in that the rules of the company made it his duty at that time and place to be standing upon the car, and that if he had been standing upon the car, as he was required to do by the rules, he would have come in contact with these whipping-straps and would have been forewarned of the tunnel and then might have placed himself in a safe position. But it is not certain that if he had been standing up and had been forewarned, he would have escaped this calamity. He might have been standing up and been forewarned and even then have assumed that it would be entirely safe for him to sit and that that would be all he was required to do. To take a recumbent position after these straps had hit him and before reaching the tunnel, with the train going ten miles an hour, he must have done so within a very few seconds; he might possibly have done it, but it would have required great activity. But we do not think he was negligent in that he was not standing, as he had not been cautioned, that, for his safety, he must stand, or that in order that he might be warned of an overhead structure, he must stand, but that he must stand in order that he might perform his duties; and it does not appear that he was negligent in his duty

Wainright v. Railway Co.

or that there was any duty then immediately incumbent upon him which required him to stand. There were in the train only five cars. The purpose of the rule requiring him to stand on the top of the cars was to put him in a position where he might see any signals given from either end of the train; and it seems that he might have performed this duty while sitting upon the tall car in this short train. At all events, if he was not in the line of his duty in not standing upon that train, we do not think, under the circumstances stated, that should be regarded as negligence contributing to his injury, because he had not been cautioned that standing was something essential to his safety, or that it had anything to do with the question of his safety.

And the same remarks would apply to his alleged negligence in sitting upon the edge of the car; we think that so far as he was not negligent in duty, and inasmuch as he was not forewarned that it was essential to his safety to maintain a position upon the center of the car, that he might, without any negligence, occupy a sitting position upon the edge of the car. He may have kept his face turned from a position fronting the locomotive to avoid the cinders, and in a measure, the smoke and gases, that we know, without evidence, as a matter of common knowledge and observation, are emitted from the smoke-stack of a moving locomotive and generally float back over a train and must be more or less annoying to one riding on the top of a box-car next to the locomotive. Or he may have looked in another direction from that in which the train was moving, through sheer indifference or inattention, and if not warned by any word or circumstance, or former knowledge or observation, that to do so while sitting upon the car would be unsafe, it cannot be said that his conduct was negligent. L. & N. Railway Co. v. Cooley, 49 S. W., 339, 5 Am. Negligence Rep., 800. Not only the warning that he had received that it would be unsafe to *stand* upon a freight car while passing certain overhead structures in the Toledo yards, but the fact that he had passed under other of these structures in safety while sitting upon this car, and the fact that no whipping-cords warned him of a lower structure, but the reliance he might easily base upon the assumption that the company would do the duty devolving upon the master of warning him of anything making it dangerous to remain at his station of duty on the top of the cars in an ordinary attitude for riding, all may have tended to make him feel secure, and to justify him on not looking ahead. Chicago, etc. Ry. v. Carpenter, 56 Fed. Rep., 451.

It is complained by the plaintiff in error that the court erred in its charge to the jury upon the subject of obvious dangers with reference to which the company would not be required to give the deceased or its employees any warning. And it is said that this was an obvious danger of that character, and that in passing through on these other trips deceased must have observed, or was bound to observe the height of that tunnel, and that upon approaching the tunnel on this occasion he was bound to see and observe the height of the tunnel.

As to his passing through on these occasions, as I have said, we cannot tell what kind of a car he was upon or what duty he may have been performing, what there might have been to interfere with his making an accurate estimate of the height. It seems to us that under ordinary circumstances, in passing through upon a moving train, one could hardly do that, and could hardly be expected or required to make such an estimate as that it would register in his mind that, if he passed through on a car which was somewhat higher than the one upon which he was riding, he

could not sit up with safety. Upon this particular occasion, even if he were approaching this tunnel with his face towards it, having no warning other than that which he might receive by his observation made there upon the instant of the height of the tunnel and as to whether he could pass through, we think that it would be unsafe to conclude that even if his mind were intent upon the tunnel, he would surely observe that the tunnel was too low for him to pass under sitting; that he could make such an accurate measurement as would inform him that he could not pass under that tunnel in safety sitting upright upon the car. There would be nothing by which he could make any comparison or measurement until the end of the car upon which he was riding had reached the end of the tunnel. Then, if he were a man of quick intelligence, and could make a quick and accurate estimate, he might see that the space between the head end of the car and the stone-work of the tunnel was not as great as that he was occupying in sitting in an upright position; and yet that observation and estimate he must make and act upon in the course of about three seconds, to escape the collision. If, however, deceased was actually looking ahead, and did see, or might by ordinary care while in that position have seen the danger in time to avoid it by changing his position, so that his failure to see or avoid would amount to negligence, still, as was said in Columbus & Terminal Valley R. R. Co. v. Marsh, 63 Ohio St., 236, recently decided by our Supreme Court, negligence must be proved and not guessed at (a proposition as fully applicable to the case of one party as to that of the other), and since he was not bound to be faced and looking toward the front end of the train, the jury would have no right to assume or guess that he was in that position, and that therefore he saw or might have seen and avoided the impending danger. Upon the subject of the duty of the master with respect to obvious dangers, the court charged the jury as follows:

" One charge of negligence against the defendant which is made in the petition is, that the defendant failed to inform the decedent of the height of this tunnel and of the danger of being struck by the tunnel while riding upon the top of the car. What is the fact—what do you find the fact to be from the evidence? Did the defendant fail to give such information, and if so, was it negligence? The defendant was under obligation to inform the decedent of the danger, and if it was not obvious to the common understanding, or if it was not reasonably to be supposed that the decedent understood and appreciated it. But if the danger was visible and apparent to one of ordinary understanding, or if the decedent knew and appreciated and understood the danger from his own observation or otherwise, then any failure of the defendant to inform or instruct him as to the danger cannot be complained of as negligence. If the company knew or ought to have known that the decedent was inexperienced, and did not know or appreciate or comprehend the peculiar or special danger existing at the tunnel, if there was such peculiar or special danger, and if such danger, could not readily be seen and understood by ordinary observation, then it was the duty of the company to warn him of such special danger and instruct him as to how it was to be avoided. But the company was under no obligation to inform or instruct him as to dangers which were the subject of common knowledge and which could readily be seen and appreciated by ordinary observation."

It is contended here on behalf of the plaintiff-in-error that the court erred in charging that the company was not bound to warn deceased of the danger if it was obvious to the common understanding, or if it could be readily seen and understood by ordinary observation, and in failing to qualify this by saying that the master must give warning unless the danger is observable or discoverable by the exercise of ordinary care and prudence; and we think this particular paragraph of this charge is open to this criticism; it does not contain any qualifications as to the time or circumstances or the opportunity for observation, but says that if the dangers could be readily observed, or were open, or apparent, or obvious to a man of ordinary observation, if they could be readily seen and appreciated then the company was not under obligation to give any warning. If that were understood in a broad sense by the jury, it would be fatal to the plaintiff's case, because any one of ordinary understanding and vision coming to that spot, with time and opportunity to observe (as for instance, persons present on the occasion when this photograph was taken of a man lying down upon the car in a recumbent position), could see and observe, it would be obvious to him, could readily be seen and appreciated by him, that a person could not safely sit in an upright position upon the furniture car passing through that tunnel. We think the court should have modified that part of the charge by saying that if the deceased, in the exercise of ordinary care, under the circumstances taking into consideration the opportunities which he had, and the duties that he was performing at the time, and the chance which he had to make the discovery, and all those things, if under those circumstances he could have observed the obstruction and the danger in time to avert it; if it were an obstruction of that kind, so that that must have been true, then the company was not bound to give any warning of it.

In other parts of the charge this qualification, or something that amounts to it, is stated. For instance, take the following paragraph:

"To entitle the plaintiff to recover it must be shown that the decedent did not know and would not have known by the exercise of ordinary and reasonable care that in riding upon the top of the car as he did he was exposing himself to the danger of injury in coming in contact with the tunnel. If he knew or understood that danger, or if by the exercise of ordinary and reasonable care he might have known and understood it, then under the law, he assumed and took upon himself the risk of injury from the danger."

This is a cognate proposition, not exactly the same, but we think the qualification is there which should have gone into the other part of the charge quoted. The charge as a whole is correct and fair and the exception is general, and therefore we do not hold that the charge is erroneous, but we think this paragraph may account for what we regard as a wrong verdict; it may have caused a misapprehension on the part of the jury and may have served in a measure to mislead the jury as to the law applicable to this feature of the case. Counsel for defendant in error cite in support of this charge the case of VanDuzen Gas and Gasoline Engine Co. v. Schelies, 61 Ohio St., 298, but we do not think it supports their contention that this paragraph is complete and beyond criticism.

The proposition that the employer is bound to call the attention of the employe to unusual dangers of his employment unless they are so obvious that they will become known to the employe by the exercise of ordinary care on his part, is supported by the following authorities:

Bailey on Master and Servant, 111, 112; Pullman Palace Car Co. v. Laack, 143 Ills., 242; Galveston, etc. Railroad Co. v. Surratt, 73 Texas 262; Holland v. Tennessee, etc., R.R. Co., 91 Ala., 444; 1 Shearman & Redfield on Negligence, sec. 203; Feeren v. Old Colony R. R., 143 Mass., 197; Motey v. Pickle Marble & G. Co., 74 Fed. Rep., 155; Louisville & N. R. R. Co. v. Miller, 104 Fed. Rep., 124; Wheeler v. Wason Mfg. Co., 135 Mass., 294.

A peril that may be visible and apparent to one in a favorable position and under favorable circumstances to observe it, might be, as to such person, an obvious peril that he would be bound to note and guard against, and of which he would not be entitled to any warning, and yet the same peril might not be ovious to another person in the same sense or degree because his position and circumstances might be less favorable to an observation and appreciation of the danger, and, therefore, the latter might be entitled to warning of its existence. Whether a servant would be guilty of negligence in failing to note, and avoid a peril of which he had no previous knowledge, or whether he would be entitled to notice thereof, must depend, we think, upon whether in the exercise of ordinary care under all the circumstances he must or should have discovered it in time to have avoided it. It is not apparent that the deceased, under the circumstances surrounding him as he approached this tunnel, in the exercise of ordinary care for his own safety, must or should have discovered this peril in time to secure his safety. The evidence on this point being fully as consistent with absence of negligence as with negligence on his part, or failing to show affirmatively that he was guilty of negligence, a conclusion that he was guilty of negligence was not warranted. Lake Shore & M. S. Ry. v. Andrews, 58 Ohio St., 426; Columbus Terminal & Valley R R. Co. v. Marsh, *supra*.

We hold, therefore, that the jury was not warranted by the evidence in finding either that the defendant was free from negligence or that the deceased was guilty of contributory negligence; but that it should have found that the defendant wa- guilty of negligence in the particular stated, and that the deceased was free from contributory negligence, and that therefore the verdict is contrary to the weight of the evidence, and for that reason the motion for a new trial should have been sustained.

On these grounds the judgment is reversed, the verdict is set aside and the cause is remanded to the court of common pleas.